**LOCAL 144, HOTEL, HOSPITAL, NURS-ING HOME AND ALLIED SERVICES UNION, SEIU, AFL–CIO, Plaintiff,**

v.

**CNH MANAGEMENT ASSOCIATES, INC., Marvin Neiman, Individually and as Sole Proprietor of Concourse Nursing Home, Defendants.**

No. 87 Civ. 2778 (RWS).

United States District Court,
S.D. New York.

May 23, 1989.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City (Daniel Engelstein and Barbara J. Olshansky, of counsel), for plaintiff.

Gibson, Dunn & Crutcher, New York City (Jonathan L. Sulds and Stephen W. Feingold, of counsel), for defendant CNH Management Associates, Inc.

Lord Day & Lord, New York City (Carl A. Schwarz, Jr., of counsel), for defendant Marvin Neiman.

## OPINION

SWEET, District Judge.

Plaintiff Local 144, Hotel, Hospital, Nursing Home and Allied Services Union, SEIU, AFL–CIO ("Local 144") has moved for an order pursuant to 9 U.S.C. § 9 confirming and enforcing the arbitration Opinion and Award of March 8, 1988 (the "Final Award") and pursuant to Rule 15(a) permitting it to amend its complaint. Defendant CNH Management Associates, Inc. ("CNH") has cross-moved for an order vacating the Final Award and dismissing Local 144's motion on the alternative grounds, first, that the court lacks power to confirm the Final Award because the plaintiff has failed to comply with Rule 3, Fed.R.Civ.P., second, that the Final Award fails to draw its essence from the parties' collective bargaining agreement and therefore the Arbitrator exceeded his powers, third, that the Final Award is not final and therefore is not susceptible to judicial action at this time, or fourth, that CNH has not completed discovery, which bars confirmation pursuant to Rule 56(f), Fed.R.Civ.P. For the reasons set forth below, the Final Award is confirmed to the extent it orders payments totaling $8,757,709 plus interest for 1981 to 1985, but vacated for amounts awarded for 1986 and 1987. Local 144's motion to amend the complaint is granted, except for its proposed claim for an accounting.

### The Parties

CNH, a management company, is one of several vendors providing labor services at Concourse Nursing Home ("Concourse"), a skilled nursing facility licensed by New York State (the "State") and owned by Marvin Neiman ("Neiman"). Since 1977, Local 144 has represented licensed practical nurses, nurses aides, orderlies, laundry workers, and kitchen staff employed by CNH at Concourse.

### The Facts

1. The Medicaid Reimbursement System

Through the Medicaid reimbursement system, the State pays health care facilities for caring for patients qualifying for Medicaid benefits. During the period at issue here, approximately 95% of Concourse's patients qualified for Medicaid, and Concourse, therefore, received about 95% of its revenues through the Medicaid reimbursement system. The operation of that system has given rise to the dispute in this case.

The State reimburses nursing home facilities according to a per diem rate for each Medicaid patient day. Until 1986, the State calculated the per diem rate using a cost-based formula. First, the State designated a base year for determining the facility's total reimbursable costs. For example, in 1981 the State selected 1978 as a base year, and in 1982 it chose 1980 as the base year. Next, the State calculated the facility's reimbursable base year costs, including labor costs (union and nonunion expenses for wages and benefits), operating costs, property costs (rental or mortgage expenses), and so forth. The State did not approve and pay automatically all costs a facility incurred. For example, the State imposed "discrete" ceilings on particular costs, such as salaries paid to administrators and relatives of facility owners. If a facility exceeded the discrete ceiling, the State would exclude the excess from its base year cost calculation.

Once the State had computed the allowable base year costs, it determined the reimbursable costs for any given year by multiplying base year costs by a "trend factor" calculated to account for inflation. The State then divided this amount by the facility's total patient days to arrive at the per diem rate.

Within this system, the State allowed for periodic adjustments for specific items of cost. If a facility convinced the State that it required additional reimbursement to cover a particular cost, the State would reimburse monies for that item and specifically designate those funds on the rate sheets for the given year. For reimbursement provided in this manner, the facility was obligated to spend the funds for the specified purpose or face recoupment by the State.

In 1982, the State modified the Medicaid reimbursement system by imposing "peer group ceilings." Peer group ceilings reflected a norm the State generated by comparing total costs at similar facilities. To the extent an individual facility's total costs exceeded the norm, the State denied reimbursement for the excess, and the facility was out of pocket for that amount.

A facility whose costs exceeded the peer group ceilings could appeal to demonstrate that the excess expenditures were necessary to operate properly, for example, because the facility's patients required specialized medical care. If the facility's appeal succeeded, the State would retroactively adjust its reimbursement rate. However, as the Interim Award observed, "the State would not approve facility costs in excess of peer group caps that represent[ed] a unilateral decision to operate as a 'Cadillac' rather than a 'Chevrolet' to provide the same necessary services." Interim Award at 9.

On January 1, 1986, the State changed its Medicaid reimbursement methodology from a cost based system to a pricing system called "Resource Utilization Group" ("RUGS"). Rather than reimbursing a facility for the costs it incurred, RUGS essentially set a price the State would pay for a facility to treat a certain type of patient.

2. Parity

When Local 144 first began representing CNH's employees, the workers received wages and benefits generally lower than those earned by workers Local 144 represented at other health care facilities. To remedy this situation, Local 144 negotiated clauses in its collective bargaining agreements that required CNH gradually to bring its employees' wages and benefits on par with those at other facilities, a process known as "parity."

CNH and Local 144 signed their first collective bargaining agreement on August 10, 1978 (the "1978 Agreement"), which included the following parity clause:

> The difference between the minimum provided for under the Metropolitan Agreement [of Greater New York] and that currently being paid by the Employer shall be implemented during the three year agreement in equal one-third (1/3) installments provided the Cost Review Panel approves increases in rates and the State actually reimburses the Employer to offset all Labor Costs.

This provision thus recognized the three corner relationship between the State, the

management of the facilities, and the union, a relationship which, to say the least, has complicated the collective bargaining process over the years and has resulted in two strikes prior to the events described here.

On June 29, 1981, CNH and Local 144 signed their second collective bargaining agreement (the "1981 Agreement"), which is at issue here. Paragraph 1 of that agreement required CNH to carry over the salaries and benefits set forth in the 1978 Agreement, "provided that any increase in such wages and economic benefits shall be subject to the reimbursement and parity provision of this agreement as contained in paragraphs 2(e) and 4."

Paragraph 2(e) set forth the parity obligation, stating:

CNH agrees that it will achieve parity in accordance with the memorandum of the parties dated August 10, 1978, and paragraph 5 of the memorandum of agreement between the State of New York and other New York Residential Health Care Facilities Association, Inc. [the "Southern Agreement"] or in accordance with such arrangement more favorable to the employees and employee benefit funds as the State of New York may approve in connection with the implementation of parity as provided in the memorandum between the parties dated August 10, 1978. CNH's only obligation with regard to the funds shall be to make the contributions required to be made to said funds in accordance with this agreement.

Paragraph 5 of the Southern Agreement between CNH's industry group, Southern New York Residential Health Care Facilities Association, Inc. (together with its member institutions) obligated the State to recognize parity pay increases required by the "Turkus Arbitration Award" as allowable costs:

... for Medicaid reimbursement purposes at twenty percent (20%) of the cost during the first year of the contract, sixty percent (60%) of the cost during the second year of the contract and one-hundred percent (100%) of the cost during the third year of the contract. There will be no retroactive recognition of parity expenses incurred prior to April 1, 1981 for Medicaid reimbursement purposes. The facility entitled to the above-cited recognition is Concourse Nursing Home.

The 1981 agreement obligated CNH to provide parity from May 2, 1981 through May 1, 1984, and the parties agreed to continue that obligation through March 31, 1987.

Paragraph 4 of the 1981 Agreement provided:

Any monies to be paid for economic benefits to be provided by CNH under any of the provisions of paragraphs "1", "2", and/or "3" of this agreement shall only be required to be paid if the State of New York approves such payment and only after the State of New York actually reimburses CNH for all such costs.

3. The Liebowitz Arbitration

Paragraph 2(b) of the 1981 Agreement set forth a table of weekly wage increases CNH was to implement during the term of the agreement. When CNH failed to pay the first raise—$26 per week effective April 1, 1981—Local 144 took the facility to arbitration. During 1982 and 1983, the parties appeared before Arbitrator Jonathan S. Liebowitz ("Liebowitz") on the question:

Did the Employer violate the collective bargaining agreement by failing to implement, in whole or in part, a $26 wage increase, and retroactively, and if so, what shall the remedy be?

Applying paragraph 4's approval/reimbursement requirement, Arbitrator Liebowitz found that the State had approved the wage increase and reimbursed CNH sufficient funds to implement that increase. In doing so, he rejected CNH's argument that paragraph 4's approval/reimbursement condition was met only when the State had reimbursed the facility's total labor costs, not just the particular costs associated with the $26 per week raise. He stated: "the Employer's claim of an overall 'deficit position' is irrelevant so long as it

was reimbursed for the wages and fringes at issue." Liebowitz Award at 16.

Arbitrator Liebowitz required CNH to pay the wage increase and associated benefits retroactively to April 1, 1981. Because he found CNH's breach to have been "egregious," he also awarded legal interest from the June 16, 1982 date when CNH received the State's reimbursement payment earmarked for the increase at issue.

### 4. CNH's Reimbursement for Parity

Pursuant to the State's allowance for periodic adjustments described above, Neiman, Concourse's owner, appealed to the State in a letter dated November 17, 1981 for additional reimbursement to fund CNH's 1981–84 contract obligations. On May 3, 1983, the State granted the appeal and issued revised rate sheets from April 1, 1981 through December 31, 1984 that included specific line items for the per diem adjustments for the $26 weekly wage increase and for the cost of providing parity to CNH employees in Local 144's bargaining unit. The State neither approved nor reimbursed any parity monies for nonunion workers at CNH. Because these reimbursement increases were periodic adjustments, they were not subject to any ceilings.

Based upon these line item adjustments, the Arbitrator in his Interim Award found for the period from April 1, 1981 through December 31, 1984: "the record is clear that CNH received a total of $6,661,738 as Medicaid reimbursement for the cost of achieving parity, including the twenty-six dollar weekly wage differential effective April 1, 1981." Interim Award at 10.

### 5. CNH's Failure to Pay Parity

Although the State purportedly reimbursed CNH for parity costs, Local 144 contends that the facility failed to increase its employees' wages and benefits to achieve parity. For example, as of June 1983 when CNH allegedly first received parity reimbursement, a nurse's aide at Concourse was receiving $215.00 dollars a week, no sick days, five paid vacation days per year, and no pension coverage or health care benefits. Local 144 claims that, had CNH implemented parity, the nurse's aid would have received $314 a week, at least two weeks vacation, fifteen paid sick days a year, twelve holidays, a shorter work week, shift differential, pension benefits, and welfare benefit coverage.

At the same time it purportedly was refusing to distribute parity funds the State had reimbursed, Local 144 argues, CNH increased management's salary. For example, Helen Neiman, Marvin Neiman's wife and Concourse's administrator, enjoyed a salary increase of over 60%—from nearly $80,000 in 1983 to $131,000 in 1986.

### 6. The First Arbitration

The 1981 Agreement expressly designated Professor John E. Sands as an arbitrator (the "Arbitrator"). Pursuant to this provision, the parties submitted the following question to the Arbitrator:

Whether the Employer violated the collective bargaining agreement by failing to pay parity in whole or in part. If so, what shall be the remedy, consistent with the parties' agreement?

The Arbitrator conducted 16 days of hearings in New York City from December 1984 to October 1985. At the hearings, both parties were represented by counsel and had the opportunity to adduce evidence, to cross-examine each other's witnesses, and to argue for their positions. Over the following year, each party submitted proposed findings of fact and conclusions of law, briefs, and reply briefs. Neither party has challenged the validity of these proceedings.

Before the Arbitrator, CNH argued that Paragraph 4 of the 1981 Agreement required it to implement parity only if the State reimbursed it fully for *all* labor costs (union and non-union), including parity. According to CNH's calculations, CNH incurred $11,832,872 in labor costs exclusive of parity between April 1, 1981 and March 31, 1984 and received $12,819,823 in Medicaid reimbursement. Subtracting total labor reimbursement from total labor costs, therefore, left $986,951 available to distribute for parity.

On March 19, 1987, the Arbitrator issued an Opinion and Interim Award (the "Interim Award") rejecting CNH's interpretation of paragraph 4 and finding that CNH had violated the 1981 Agreement by failing to pay parity. The Arbitrator granted a fixed-dollar remedy for the period ending December 31, 1984 and injunctive relief thereafter. Finding that the minimum amount CNH owed its employees was $6,271,240, and perhaps as much as $6,671,738, the Arbitrator directed: "CNH shall immediately pay the minimum amount due —$6,271,240—plus interest" into an escrow account for final disposition. (Interim Award at 28). He also required CNH to continue in effect full parity with master contract wage and benefit levels after December 31, 1984 and retained jurisdiction "to resolve any disputes between the parties concerning interpretation, computation, and application of [the] Interim Award." *Id.* at 31. Familiarity with the Interim Award is assumed.

### 7. Efforts to Enforce the Interim Award

When CNH and Concourse failed to comply with the Interim Award, Local 144 sued CNH and Neiman, individually and as sole proprietor of Concourse, alleging four causes of action. The first and second causes of action sought to enforce the Interim Award against CNH and Neiman, respectively. The third cause of action alleged equitable subrogation against Neiman. The fourth cause of action stated a RICO claim against Neiman.

After filing the complaint, Local 144 moved pursuant to 9 U.S.C. § 9 for an order confirming and enforcing the Interim Award. CNH cross-moved pursuant to Rule 12(b)(6), Fed.R.Civ.P., and 9 U.S.C. § 10 for an order dismissing Local 144's petition on the ground that the Award was not final and therefore not subject to judicial confirmation. Alternatively, CNH argued that the Arbitrator had exceeded his powers and had fashioned an award that was beyond the scope of his authority.

In an opinion dated September 16, 1987 (the "Opinion"), this Court granted in part and denied in part the motion and cross-motion. *See Local 144, Hotel, Hosp., Nursing Home, and Allied Servs. Union v. CNH Management Assocs., Inc.,* 669 F.Supp. 632 (S.D.N.Y.1987). Finding that the Interim Award was final only as to the fixed-dollar amount the Arbitrator had ordered CNH to pay into escrow, this court confirmed that portion of the Interim Award, but refused to confirm the remainder. The Opinion then addressed CNH's argument that the fixed-dollar award exceeded the Arbitrator's powers and failed to draw its essence from the collective bargaining agreement, stating:

Here, there is a strong probability that Local 144 will prevail on merits at the time of the final award.... In the Interim Award, which by its very terms will convert to a Final Award by the mere passage of time, the Arbitrator carefully parsed the 1981 Agreement and set forth the factual findings upon which he based his conclusions. A court must not enforce an arbitration award when "the arbitrator's words manifest an infidelity" to a collective bargaining agreement. [*United Steelworkers of Amer. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 [80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424] (1960) ]. However, "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." [*Id.* at 599, 80 S.Ct. at 1362]. Here the alleged "infidelity" is that the arbitrator construed the phrase "and/or" in the contract as "or" (as management urged). This is not an infidelity but the kind of construction of the language of the collective bargaining agreement that a court should let stand even if it disagrees with it.

*Local 144,* 669 F.Supp. at 634–35. The Opinion concluded:

Local 144's petition to confirm an arbitration award is dismissed, except with respect to the Arbitrator's order in the nature of preliminary relief that CNH pay a sum certain into escrow. The order to pay funds into escrow is con-

firmed. The case is closed, with the court retaining jurisdiction, on motion and without payment of filing fees, to enter all necessary orders or conduct any future proceedings in the case as if it had not been closed.

*Id.* at 635. Familiarity with the Opinion is assumed.

On November 9, 1987, the court entered judgment dismissing the case pursuant to the Opinion and granting leave to reopen without payment of additional filing fees.

Upon receiving the judgment, Local 144 moved pursuant to Rules 52(b) and 59(c), Fed.R.Civ.P., to amend the judgment to address only the first cause of action and to direct CNH to pay the required amount into an escrow account. CNH cross-moved for relief from the judgment pursuant to Rule 60, Fed.R.Civ.P., stating that the discovery of new evidence warranted reconsideration of the Interim Award.

CNH identified two facts that it claimed constituted new evidence. First, on November 4, 1987, CNH learned that neither the State nor the Association had executed the Southern Memorandum, paragraph 5 of which the 1981 Agreement incorporated and the Arbitrator allegedly relied upon. Instead, the State and the Association entered into a different agreement, dated November 12, 1981, which omitted paragraph 5 and made no reference to Concourse.

Second, CNH claimed that William F. Gormley ("Gormley"), the Director of the State's Bureau of Residential Health Care Facilities Reimbursements, had stated that the State had not provided parity on a line item basis for 1986 and 1987 and that he was uncertain what the State had paid CNH for 1985. Gormley allegedly said the Department of Health "went out of the labor business" as of January 1, 1986 because RUGS offered no way for the State to fund the cost of parity at a particular facility through increased reimbursements.

On December 16, 1987, the Court heard oral argument on the parties' motions and issued an oral order reopening the case, reinstating the second, third, and fourth causes of action, and staying the judgment pending the Arbitrator's determination on CNH's newly-discovered evidence claim.

### 8. The Second Arbitration and Final Award

On January 6, 1988, the Arbitrator conducted further hearings to consider CNH's request for reopening and reconsideration based on newly-discovered information and Local 144's application for a final award setting forth the exact amount of damages. Both sides appeared by counsel and had an opportunity to adduce documentary evidence and to offer further proof, as well as to argue in support of their positions. Each also submitted a post-hearing memorandum. Neither party has challenged the validity of that proceeding.

Following the hearing, the Arbitrator denied CNH's request to reopen the record and reconsider the Interim Award and granted the Union's request for a final award based upon formula relief. The Final Award found that CNH had violated the 1981 Agreement by failing to pay parity to bargaining unit employees and directed CNH immediately to pay into escrow $6,271,240 plus interest for the period April 1, 1981 through December 31, 1984 and $7,459,407 plus interest for the period January 1, 1985 through December 31, 1987, plus such additional amounts for that period as might later be calculated to be due under the Final Award. Familiarity with the Final Award is assumed.

On March 22, 1988, Local 144 demanded that Concourse and CNH comply with the Final Award by depositing the requisite sum into an escrow account, but both refused. On June 3, 1988, CNH sued to vacate the Final Award and that suit was consolidated with the present action on July 29, 1988.

### 9. CNH's Alleged Credits

CNH contends that it is entitled to a $4,763,923 credit against the Final Award for payments it already has made on account of parity in each of the years from 1981 through 1988.

Local 144 disputes this claim, however, arguing that the amounts are inconsistent

with representations CNH previously made to the State. In a letter dated July 10, 1985, Ira F. Geffner ("Geffner"), Concourse's comptroller, represented that in 1983 Concourse paid $176,361 on account of parity. CNH now claims that the amount paid in 1983 was $679,411. Similarly, in a July 10, 1983 letter, Geffner claimed the facility paid $89,226 in 1984, but CNH now claims it paid $672,900 that year. Local 144 contends that these discrepancies arise because CNH is claiming credit for monies the facility paid for contract increases that the State reimbursed separately and that were not part of the Sands arbitration. According to Local 144, the State in fact paid more than $3.0 million dollars during 1981 to 1985 for regular wage increases in addition to the funds it provided for parity.

*Power to Confirm the Final Award*

CNH contends that this court lacks the power to confirm the Final Award. Because Local 144's first cause of action to confirm the Interim Award allegedly was dismissed and never reopened and because the union purportedly has yet to assert a cause of action to confirm the Final Award, CNH argues, Local 144 has not commenced a civil action under Rule 3, Fed.R.Civ.P., and this court lacks power to entertain a motion. *See Rapoport v. Banco Mexicano Somex, S.A.,* 668 F.2d 667 (2d Cir.1982); *United States v. Black,* 356 F.Supp. 366 (W.D.N.Y.1973); *Children's Dress, Infant's Wear, Housedress and Bathrobe Makers' Union, Local 91 v. Frankow Mfg.,* 183 F.Supp. 671 (S.D.N.Y.1960).

■ Contrary to CNH's procedural argument, however, Local 144's motion to confirm the Final Award properly is before this court. In closing the case for statistical purposes and in hopes that no further court intervention would be necessary, the Opinion looked to the possibility of future proceedings arising from the arbitration, stating: "The case is closed, with the court *retaining jurisdiction, on motion* and without payment of filing fees, *to enter all necessary orders or conduct any future proceedings in the case as if it had not been closed." Local 144,* 669 F.Supp. at 635 (emphasis added). Moreover, as set forth below, Local 144 is granted leave to amend its complaint to reassert a cause of action to confirm the Arbitrator's award. Local 144 and CNH have ably and amply joined issue on the Final Award's validity, and no purpose would be served by delaying consideration on the merits of Local 144's motion to confirm and CNH's motion to vacate.

*Review of the Final Award*

1. Standard of Review of an Arbitrator's Award

In reviewing a labor arbitrator's award, the district court's function is extremely narrow, limited only to determining whether the award "draws its essence from the collective bargaining agreement." *United Steelworkers of Amer. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). The reviewing court cannot reverse an arbitrator's award because it would construe the contract differently. As the Supreme Court stated in *Steelworkers:*

> the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Id.* at 599, 80 S.Ct. at 1362. Nor can the reviewing court reverse an arbitrator's award "on the ground that the arbitrator[ ] erred in [his] factual findings, or that the arbitrator[ ] reached faulty legal conclusions, or that the proceedings were flawed." *Mitchell v. United Parcel Serv., Inc.,* 624 F.2d 394 (2d Cir.1980); *see also Steelworkers,* 363 U.S. at 596, 80 S.Ct. at 1360 ("The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.").

2. Construction of the Collective Bargaining Agreement

Paragraph 4 of the 1981 agreement sets forth the conditions precedent that activate

CNH's obligation to implement the parity provisions described in paragraphs 1 and 2(e):

> Any monies to be paid for economic benefits to be provided by CNH under any of the provisions of paragraphs "1", "2," and/or "3" of this agreement shall only be required to be paid if the State of New York approves such payment and only after the State of New York actually reimburses CNH for all such costs.

In the arbitrations before Liebowitz and Sands, as well as before this court, CNH has argued that paragraph 4 obligates it to pay parity only after the State (1) approves the payment and (2) actually reimburses it for *all* labor costs (union and nonunion), as well as costs associated with achieving parity.

■ Both arbitrators have rejected this interpretation, ruling instead that paragraph 4's conditions precedent include (1) State approval of the payment and (2) actual reimbursement of the *particular* costs at issue. For example, Arbitrator Liebowitz required CNH to pay the $26 weekly wage increase after Local 144 established that the State actually had reimbursed CNH for the costs associated with the raise, even though the State had not fully reimbursed the facility for other labor costs. He stated: "[CNH's] claim of a 'deficit position' is irrelevant so long as it was reimbursed for the wages and fringes at issue." Liebowitz Award at 16.

Arbitrator Sands reached the same conclusion. During the arbitration hearings, Local 144 argued that "the parties' agreement requires payment of parity money to bargaining unit employees because Paragraph 4's approval/reimbursement condition has been met by the State's specific approvals and reimbursement of parity costs for those bargaining unit employees." Interim Award at 14. Arbitrator Sands adopted this interpretation, noting: "[o]n the entire record before me, including my assessments of witnesses' credibility and the probative value of evidence, I must sustain the Union's primary argument." *Id.* at 15.

In *Steelworkers*, the Supreme Court stated that a reviewing court should reverse an arbitrator's construction of the collective bargaining agreement only when the Arbitrator's words "manifest an infidelity" to the "essence" of the agreement. 363 U.S. at 597, 80 S.Ct. at 1361. As this court's earlier Opinion noted:

> Here the alleged "infidelity" is that the arbitrator construed the phrase "and/or" in the contract as "or" (as management urged). This is not an infidelity but the kind of construction of the language of the collective bargaining agreement that a court should let stand even if it disagrees with it.

*Local 144*, 669 F.Supp. at 634–35. Accordingly, the Arbitrator's interpretation of paragraph 4 of the 1981 Agreement is confirmed.

### 3. Factual Findings

The Arbitrator found that the State had approved the parity payments at issue, Interim Award at 21, and CNH does not dispute that finding here. However, CNH contends that paragraph 4's second condition precedent has not been fulfilled because the State has not actually reimbursed it for carry over union labor costs from 1981 to 1985, for the cost of approximately 45 union employees that the State excluded through ceiling cuts from 1982 to 1985, for non-union parity costs from 1981 to 1985, and for all parity payments for 1986 and 1987.

#### a. Actual Reimbursement for Parity for 1981 to 1984

In his Interim Award, the Arbitrator found:

> for the period April 1, 1981 through December 31, 1984 New York State reimbursed CNH for the total cost of parity, including the twenty-six dollar weekly wage differential in the amount of $6,671,738. That figure more than reimbursed the $6,271,240 gross cost for the same period of providing parity (including the twenty-six dollar weekly wage differential) and of paying overtime for

additional hours worked beyond the Master Contract's work week.

Interim Award at 22.

The record supports this factual finding. After December 31, 1984, the Arbitrator conducted some fifteen days of hearings and received post-hearing findings of fact from the parties. The State's rate sheets for this period contained line items demonstrating that CNH received funds specifically earmarked for parity costs, and Gormley, the State official responsible for setting Medicaid rates for Concourse, testified at the hearings that the State reimbursed CNH for parity costs. This court already has recognized the soundness of this factual finding in its earlier Opinion, *see Local 144*, 669 F.Supp. at 634–35, and that finding is confirmed here.

#### b. Actual Reimbursement for Parity for 1985

Determining whether the State actually reimbursed CNH for parity costs for 1985 is more difficult. Although the State continued to apply a cost based reimbursement system in 1985, the record does not establish whether the State funded parity on a line item basis that year. In contrast, Neiman's November 17, 1981 request sought reimbursement to fund CNH's contract obligations only from 1981 to 1984, and that request prompted the State to add a specific line item for parity to its rate sheets.

CNH's principal argument for vacating the Arbitrator's award for 1985 is that the Arbitrator had insufficient facts before him to support a finding that the State had actually reimbursed CNH for parity costs for that year.[1] However, the Arbitrator conducted hearings from February through October of 1985, and the parties submitted proposed findings of fact during the following year. Although this evidence is less substantial than that supporting the award for 1981 to 1984 because the Arbitrator concluded the hearings before 1985 ended, the Arbitrator had sufficient evidence before him to determine whether the State actually reimbursed CNH for 1985 parity costs.

Based upon this evidence, the Arbitrator in his Interim Award found:

[O]n the entire record I am satisfied that the State has continued to meet Paragraph 4's approval/reimbursement conditions for bargaining unit parity following December 31, 1984.... I find credible and persuasive Mr. Gormley's testimony (as well as that of Union witness Melvin Feder) that the State has continued to provide Medicaid reimbursement to CNH for the full cost of union parity (including the twenty-six dollar weekly wage increase) after December 31, 1984.

Interim Award at 22. In light of the substantial deference accorded an arbitrator's factual findings, *see Mitchell v. United Parcel Serv., Inc.*, 624 F.2d 394 (2d Cir. 1980), the Arbitrator's ruling that the State actually reimbursed CNH for parity costs for 1985 is confirmed.

#### c. Actual Reimbursement for Parity for 1986 and 1987

The Arbitrator based his finding of actual reimbursement for 1986 and 1987 upon the fact that the 1981 Agreement obligated CNH to pay 100% parity by 1983, and that 1983 was the base year the State used to trend forward costs for 1986 and 1987. Interim Award at 18. To the extent the 1983 reimbursement rate incorporated parity, therefore, CNH would have received reimbursement for 1986 and 1987.

However, several factors in the record bring this finding into question. First, because the extensive factual hearings ended in late 1985, the Arbitrator heard little evidence regarding reimbursement for 1986 and 1987, basing his ruling upon only one day of hearings and the parties' written submissions. Second, the State changed its reimbursement system on January 1, 1986 from a cost based calculation to RUGS's

---

1. Significantly, CNH does not deny that it received reimbursement for parity for 1985. In his affidavit, Aaron J. Kaufman, CNH's controller who supervises the facility's reimbursement from the State, asserts: "I am absolutely certain that Concourse has never received any monies since 1986 which have been designated in any way as 'parity.'" Kaufman Aff. at 7. He makes no such claim about the 1981 to 1985 period, however.

price based approach. Moreover, the Final Award itself indicates that the 1983 base rate in fact may not have resulted in actual reimbursement for parity in 1986 and 1987:

However the State calculated reimbursement for those years, one thing is absolutely clear: CNH's continuing rates in effect during and after 1984 contain full provision for 100% of CNH's cost of achieving parity for bargaining unit employees. It is irrelevant that CNH may thereafter have lost entitlement to reimbursement by reason of its own intentional and egregious refusal to pay parity during 1983 ... or by reason of changes in reimbursement methodology applicable to all contracted homes, because CNH has available to it avenues for appeal and amended applications after compliance with its parity obligation. CNH cannot, as it apparently seeks to do, prospectively reduce its future parity obligation by its past and as yet unremedied contract breaches.

Final Award at 18.

Although district courts perform a limited role in reviewing labor arbitration awards, this case presents a situation in which the award for 1986 and 1987 fails to "draw[ ] its essence from the collective bargaining agreement." *United Steelworkers of Amer. v. Enterprise Wheel & Car. Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). True, CNH might obtain reimbursement by amending its reimbursement applications or appealing changes in the State's reimbursement methodology, but the 1981 Agreement obligated CNH to pay parity only *after* the State *actually* had reimbursed it for costs associated with implementing parity. The agreement contains no provision waiving the actual reimbursement condition where CNH is at fault or has avenues of appeal open to it.

Until Local 144 establishes that CNH actually received reimbursement for costs associated with implementing parity for 1986 and 1987, CNH has no obligation to pay parity. Accordingly, that portion of the Final Award ordering CNH to pay parity for 1986 and 1987 is vacated, subject to a future arbitration.

### 4. Appropriateness of Formula Relief

CNH argued in arbitration that the Arbitrator could not finalize his award without taking evidence on and calculating each individual employee's entitlement to parity payments. The Arbitrator rejected this argument and adopted formula relief, finding that individual calculation would cause unnecessary delay and expense, that the amounts would not differ significantly under individual calculation and formula relief, and that the record contains ample information to provide formula relief.

Pursuant to this formula, the Arbitrator found that CNH owed its employees $6,271,240 plus interest for 1981 to 1984 and $7,459,407 plus interest for 1985, 1986, and 1987, which represented three times the aggregate amount due for 1984 when parity was at 100%. Because the Arbitrator's award regarding 1986 and 1987 is vacated, the latter amount is reduced to $2,486,469 plus interest, amounting to formula relief totaling $8,757,709 plus interest.

A reviewing court must accord considerable deference to an arbitrator's remedy. As the Supreme Court has noted:

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of the problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

*United Steelworkers of Amer. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Because the Arbitrator's formula relief "draws its essence from the collective bargaining agreement," *id.*, his order that CNH pay into escrow $8,757,709 plus interest is confirmed.

5. The Award is Not Punitive

■ CNH argues that the Final Award should be vacated because it is punitive, not compensatory. The Opinion already considered and rejected this argument:

[A]ccording to CNH the award should not be confirmed because ... the award is in the nature of punitive damages outside the scope of the agreement. The Arbitrator's award, however, explicitly sought only "to restore bargaining unit personnel to the positions they would have occupied but for the Employer's breach," [Interim Award at 23], and, as CNH concedes, the size of the award is linked to the construction of the Agreement, which the arbitrator construed in a manner contrary to CNH's wishes....

*Local 144*, 669 F.Supp. at 635. That argument again is rejected here. The award compensates the employees for CNH's failure to pay parity as the 1981 Agreement required, and the award is substantial because CNH's breach was substantial.

6. The Award is Final

In support of its motion to vacate, CNH has submitted its controller's affidavit, which argues that CNH already has paid its employees $4,763,923 on account of parity that must be credited against the Final Award. Local 144 disputes this amount, and CNH contends that the Arbitrator must hold additional hearings to resolve this dispute, quoting the Final Award:

Obviously, none of these figures includes interest due under my Award, nor does any reflect credit for payments CNH made while this case was pending.... As to matters of credit for payments on account, CNH has both the burden and resources to prove such payments; and in any future enforcement proceeding CNH shall have to bear that burden or lose the credits it claims.

Final Award at 16. CNH offers the following definition of "final":

It is the general rule with regard to the confirmability of arbitration awards that, in order to be "final" and "definite," the award must both resolve all the issues *submitted to the arbitrator*, and determine each issue fully so that no further

litigation is necessary to finalize the obligations of the parties under the Award.

CNH's Mem. at 56 (quoting *Puerto Rico Maritime Shipping Auth. v. Star Lines Ltd.*, 454 F.Supp. 368, 372 (S.D.N.Y.1978)) (emphasis added). Until the Arbitrator resolves the credit issue, CNH maintains, the award is not final and cannot be confirmed.

■ However, CNH's claim for credits for payments it allegedly made on account of parity will not bar this court from confirming the Final Award. First, CNH never submitted this claim to the Arbitrator. Although the matter was before the Arbitrator from late 1984 until early 1987, CNH failed to provide a schedule of payments it allegedly made on account of parity until it submitted Kaufman's affidavit in support of its motion to vacate the Final Award. Indeed, neither the Interim Award nor the Opinion made any reference to CNH's purported parity payments.

. Moreover, CNH's contention that it has paid more than $4 million on account of parity appears to be at variance with the positions it has taken throughout the arbitration and before this court. CNH consistently has argued that the 1981 Agreement obligated it to pay parity only after the State actually had reimbursed it for all labor expenses, union and nonunion alike. According to CNH, however, it has yet to receive full reimbursement, and therefore no obligation to pay parity has accrued. CNH also has maintained that subtracting total labor costs from total labor reimbursement during 1981 to 1984 left it only $986,951 to pay on account of parity and that it received no reimbursement for parity in 1986 and 1987.

CNH's attempt to prevent confirmation of the Final Award by claiming previously unasserted credits may fit a pattern that three arbitration awards have described. Arbitrator Liebowitz found that CNH's failure to pay parity was "egregious" and Arbitrator Sands's Interim Award described CNH's conduct as "intentional and egregious." The Final Award, however, contains the strongest indictment:

I infer from those facts, from the "intentional and egregious" nature of CNH's breach that I found in [the Interim Opinion], and from the paucity of substance in CNH's present requests for reopening and reconsideration, that *CNH has been motivated by a continuing desire to put off as long as possible the day on which it must make good its parity obligation to bargaining unit employees.*

Final Award at 13 (emphasis added).

This ruling does not deny CNH the right to obtain credits for payments it may have made on account of parity—it can submit the issue for arbitration in the future. However, CNH bears the burden of pleading and proving its entitlement to credits, and it will not be permitted to remain silent on this issue throughout a prolonged arbitration, then raise it at the last minute as a bar to confirming the Final Award.

### 7. Alleged Outstanding Discovery

CNH contends that Local 144's motion to confirm should be dismissed or adjourned pursuant to Rule 56(f), Fed.R.Civ.P., so CNH can depose Gormley regarding reimbursement in 1986 and 1987. As set forth above, the Arbitrator had sufficient evidence to find reimbursement from 1981 to 1984 and for 1985, but not for 1986 and 1987. Accordingly, the additional discovery CNH requests is irrelevant to that portion of the Final Award that is confirmed here.

*Leave to Amend the Complaint*

The first complaint filed in this action (the "complaint") alleged four causes of action. The first and second claims sought to enforce the Interim Award against CNH and Neiman, respectively. The third cause of action alleged equitable subrogation against Neiman. The fourth cause of action stated a RICO claim against Neiman.

Local 144 has moved to amend the complaint (the "amended complaint") to reflect the Final Award, to supplement its RICO cause of action, to change its description of Neiman as a "joint employer" to "the employer, or in the alternative an employer" of Local 144's members, and to characterize CNH as Neiman's "agent." Local 144 also seeks to add causes of action for common law fraud, unjust enrichment, monies had and received, and an accounting.

CNH does not oppose Local 144's motion to amend the complaint. Neiman does not oppose amending the complaint to reflect the Final Award, but he contends that the causes of action for RICO, unjust enrichment, and an accounting would be futile. Neiman conditions his opposition to the remaining amendments on obtaining further discovery. In a letter to the court dated March 23, 1989, Local 144 stated that it did not oppose setting a new discovery date.

Pursuant to the parties' agreement that further discovery is necessary, the discovery date is extended to September 6, 1989, and the amendments for which Neiman conditioned his opposition upon further discovery are granted. Because the defendants offer no opposition, the amendment to reflect the Final Award also is granted.

### 1. Standards for Motion to Amend the Complaint

Rule 15(a), Fed.R.Civ.P., requires a party to amend its pleadings by leave of court and provides that "leave shall be freely given when justice so requires." This is a liberal standard, but the Supreme Court has stated that leave to amend should not be granted where there exists undue delay, bad faith, or dilatory notice on the mover's part, undue prejudice to the opposing party, or futility of the amendment. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1982).

### 2. Amendment to the RICO Claim

■ The complaint currently contains a RICO cause of action, and the amended complaint incorporates the Final Award into that claim and rephrases some of the facts underlying it. CNH contends that the proposed amendments to the RICO claim would be futile because there is no continuity or threat of continuity in Neiman's alleged "pattern" of unlawful activity. *See Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.1989); *United States v. Indeli-*

*cato,* 865 F.2d 1370 (2d Cir.1989). However, Neiman has yet to move to dismiss the original RICO cause of action.

Neiman's futility argument appears in a curious context. If the proposed amendments are rejected, the RICO claim will survive (in unamended form), and Neiman subsequently will have to move to dismiss that claim. A court usually invokes futility to deny an amendment that adds a new cause of action having no hope of surviving a subsequent motion to dismiss. *See, e.g., Dan Caputo Co. v. Russian River County Sanitation Dist.,* 749 F.2d 571 (9th Cir. 1984). The rationale for this is obvious: by barring the futile cause of action at the amendment stage, the court saves the defendant the trouble of later moving to dismiss the claim. Neiman avoids no such trouble here, however, because he must move to dismiss the original RICO claim anyway.

■ Moreover, Local 144 conceivably could have styled its motion to amend the RICO cause of action as a motion to supplement the pleadings pursuant to Rule 15(d), Fed.R.Civ.P., which states:

> Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted *even though the original pleading is defective in its statement of a claim for relief or defense.*

(Emphasis added). Although Rule 15(d) does not include Rule 15(a)'s mandate that leave to amend be freely given when justice so requires, the same standard applies to motions under both these subdivisions of Rule 15. *See Johnson v. Kay,* 126 F.R.D. 16, 18 (S.D.N.Y.1989); *Forbes & Wallace, Inc. v. Chase Manhattan Bank,* 79 F.R.D. 563, 564 (S.D.N.Y.1978).

Accordingly, Local 144's motion to amend its RICO cause of action is granted, and Neiman remains free move to dismiss to amended RICO claim.

### 3. The Unjust Enrichment Claim

■ Neiman contends that the proposed unjust enrichment cause of action is futile because Local 144's own theory of the case implies that Neiman's alleged wrongdoing provides him no real benefit, which is an element of the cause of action. *See McGrath v. Hilding,* 41 N.Y.2d 625, 363 N.E.2d 328, 394 N.Y.S.2d 603 (1977). If he possesses parity monies that CNH has not paid out, Neiman argues, the State will reclaim those funds, leaving him in the position of "holding monies temporarily while the State prepared to take them back." Neiman Mem. at 17. At this stage, however, the nature of Neiman's benefit and the State's likely course of action is unknown. Accordingly, the motion to amend the complaint to add an unjust enrichment cause of action is granted.

### 4. The Claim for an Accounting

■ Local 144's motion to add a claim for an accounting is denied. Under New York law, "[t]he right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of duty imposed by that relationship representing property in which the party seeking the accounting has an interest." *Palazzo v. Palazzo,* 121 A.D.2d 261, 503 N.Y.S.2d 381, 384 (1st Dep't 1988). An employment relationship does not constitute a "confidential or fiduciary" relationship. *See Boyle v. Wegman,* 25 Misc.2d 193, 200 N.Y.S.2d 82 (N.Y.Sup.Ct.1960); 1 Am.Jr.2d *Accounts and Accounting* § 30, at 183 (1979).

Local 144 argues that the confidential or fiduciary relationship requirement is not absolute, noting that courts also award an accounting where "special circumstances are present warranting equitable relief in the interests of justice." *Grossman v. Laurence Handprints,* 90 A.D.2d 95, 455 N.Y.S.2d 852, 858 (2d Dep't 1982). However, the circumstances of this case do not justify departing from the confidential or fiduciary relationship requirement. The amount Neiman allegedly owes Local 144's members is ascertainable and an adequate

**694**

remedy at law is available. An allegation of fraud alone does not warrant an accounting.

*Conclusion*

For the reasons set forth above, the Final Award is confirmed to the extent it orders payments totaling $8,757,709 plus interest for 1981 to 1985, but vacated for amounts awarded for 1986 and 1987. Local 144's motion to amend the complaint is granted, except for its proposed claim for an accounting. Submit judgment on notice.

It is so ordered.